AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

DEC − 3 2018

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*
In the Matter of the Search of One Lot of Cellular Phones
Currently Located at FBI Evidence Locker at 9325
Discovery Blvd, Manassas, VA 20109

Case No.  1:18sw 715

)
)
)
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) & 846 | Conspiracy to Distribute Marijuana |
| 18 U.S.C. 922(g)(1) | Felon in Possession of a Firearm |
| 18 U.S.C. 924(c)(1)(A) | Use and Carry of a Firearm During and in Relation to a Drug Trafficking Crime |

The application is based on these facts:

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Reviewed by AUSA/SAUSA:

| Colleen E. Garcia |
|---|

Mark J. Grado, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

Date: _12/3/18_

City and state: Alexandria, VA

The Hon. Michael S. Nachmanoff
*Printed name and title*

## ATTACHMENT A

The property to be searched is listed below (hereinafter referred to as "the Device"). The Device is currently located in the FBI evidence locker, which is located at 9325 Discovery Boulevard, Manassas, Virginia 22043, which is within the Eastern District of Virginia. The DEVICES described as an Apple iPhone IMEI: 990002824973604, a Kyocera cell phone MEID: 268435459905978861, a ZTE T-Mobile cell phone IMEI: 865074012306063, a Huawei cell phone IMEI: 860525020367434, and a Samsung cell phone IMEI: 355880056598929.

The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## **ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute controlled substances), Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm), and Title 18, United States Code, Section 924(c)(1)(A) (use and carry of a firearm during and in relation to drug trafficking offenses), and involve Nasiru Carew and Jerry Haymon, including:

   a.  any conversations, whether through text messages or other applications, where Carew discusses controlled substances, firearms, or the transfer of money between bank accounts and the purchase of high value items;

   b.  lists of customers and related identifying information;

   c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e.  any information related to sources or purchases of firearms;

   f.  any photographs or videos of controlled substances or firearms; and

   g.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DEC - 3 2018

IN THE MATTER OF THE SEARCH OF
ONE LOT OF CELLULAR PHONES
CURRENTLY LOCATED AT FBI
EVIDENCE LOCKER AT 9325 DISCOVERY
BLVD, MANASSAS, VA 20109

1:18-sw- 715

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR SEARCH WARRANTS

I, Mark J. Grado, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for search warrants authorizing the examination of property—

cellular phones—that is currently in law enforcement possession, and the extraction from the

devices of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been so employed since 2014. I am currently assigned to the FBI's Washington Field Office,

Northern Virginia Resident Agency, and have been so assigned since November 2014.  The

squad I am assigned to conducts investigations with officers and agents of the Northern Virginia

Gang Task Force as well as the High Intensity Drug Trafficking Area programs within the

greater Washington Field Office's area of responsibility and elsewhere.  As a member of this

squad, my duties include, but are not limited to, investigating violations of state and federal laws

concerning the unlawful importation, manufacture, and distribution of controlled substances.

3.      Based on my training and experience, and the experience of other law

enforcement officers, in investigating narcotics and the distribution of narcotics while armed, I

know that it is common for individuals engaged in such activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics traffickers to use multiple "smart" phones to communicate with co-conspirators in order to obfuscate their illegal activity and avoid detection by law enforcement. Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

4. Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that JERRY HAYMON ("HAYMON"), NASIRU CAREW ("CAREW"), and others known and unknown, have conspired to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 . I further believed that HAYMON and CAREW have used the cellular phones described in Attachment A, to further the drug distribution conspiracy, and that the information found on these phones will contain evidence of the offense, as set forth in Attachment B.

5. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and state law enforcement officers, and information obtained from interviews and analysis of reports.

6. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

2

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is an Apple iPhone, IMEI: 990002824973604 (hereinafter **DEVICE 1**); a Kyocera cell phone, MEID: 268435459905978861 (hereinafter **DEVICE 2**); a ZTE T-Mobile cell phone, IMEI: 865074012306063 (hereinafter **DEVICE 3**); a Huawei cell phone, IMEI: 860525020367434 (hereinafter **DEVICE 4**); and a Samsung cell phone, IMEI: 355880056598929 (hereinafter **DEVICE 5**) (collectively "the DEVICES").

8.      The Devices are currently located in the FBI evidence locker, which is located at 9325 Discovery Boulevard, Manassas, Virginia, which is within the Eastern District of Virginia. The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of identifying electronically stored data more particularly described in Attachment B.

### PROBABLE CAUSE

A.      Background of Investigation

9.      In March 2017, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and FBI began jointly investigating members of a set of the Bloods street gang. The set called the Imperial Gangsta Bloods ("IGB") consisted of several narcotics traffickers and violent crime members who were involved in criminal activity in Northern Virginia, Washington D.C, and elsewhere.

10.     In March of 2017, the joint investigation targeting IGB identified NASIRU CAREW, along with several members of his drug trafficking organization (DTO), operating in Maryland, California, and areas within the Eastern District of Virginia. CAREW was later confirmed as the leader of this organization that purchased large quantities of marijuana and Tetrahydrocannabinol (THC) edible products in California for distribution in Maryland, Virginia, and California.

3

11.     On December 6, 2017, CAREW and nine members of his distribution organization were arrested pursuant to a criminal complaint issued in the Eastern District of Virginia. At the time of CAREW's arrest, he was in possession of approximately 82 pounds of marijuana separated into one-pound vacuum-sealed packages for sale and distribution.

12.     On April 13, 2018, CAREW pled guilty to conspiracy to distribute 1,000 kilograms or more of marijuana and THC, in violation of Title 21, United States Code, Sections 841 and 846. Additionally, seven of CAREW's co-conspirators have also pled guilty to the use of a firearm in furtherance of drug trafficking, in violation of Title 18, United States Code, Section 924(c). The remaining two co-conspirators have pled guilty to conspiracy to distribute marijuana and THC, in violation of Title 21, United States Code, Sections 841 and 846.

13.     During law enforcement interviews in 2018, cooperating defendants from CAREW's DTO identified several marijuana and THC suppliers living in California. They identified JERRY HAYMON ("HAYMON") as one of several of CAREW's suppliers and co-conspirators. Additionally, during the interviews, several cooperating defendants stated that they used cellular phones to communicate with CAREW regarding the distribution and sale of controlled substances. These cooperating defendants have been independently corroborated through review of their cell phones and discussions with others in CAREW's DTO, and they have been deemed reliable.

B.     Cooperating Defendants

14.     Cooperating Defendant-1 ("CD-1") was a member of CAREW's DTO and has pled guilty to conspiracy to distribute marijuana and THC. CD-1 has personally communicated with the members of the CAREW DTO regarding acquiring and selling marijuana and THC, and has personally communicated with HAYMON regarding the purchasing and shipment of

4

controlled substances using the U.S. Postal Service and other parcel couriers. Additionally, CD-1 has met HAYMON in person and provided him with money to purchase controlled substances for shipment to locations in the Eastern District of Virginia. CD-1 has personal knowledge of the methods of communication utilized by the CAREW DTO in order to communicate and coordinate their distribution activities amongst its members. CD-1 has agreed to cooperate with the United States Government because he hopes to receive consideration for a lesser sentence. CD-1 has been and will be referred to in the masculine gender, regardless of CD-1's true gender.

15. **Cooperating Defendant - 2 ("CD-2")** was a personal friend and narcotics business partner of CD-1. CD-2 has pled guilty to two counts of conspiracy to distribute cocaine and heroin. CD-2 and CD-1 have conspired to purchase marijuana from several California sources of supply, to include HAYMON. CD-2 has personally met HAYMON and has provided him money to purchase controlled substances. CD-2 has agreed to cooperate with the United States Government because he hopes to receive consideration for a lesser sentence. CD-2 will be referred to in the masculine gender, regardless of CD2's true gender.

C. Early Investigation of CAREW and HAYMON

i. *Home invasion of a residence located in Woodbridge, Virginia*

16. On November 29, 2013, the Prince William County Police Department ("PWCPD") responded to a home invasion call at a residence located in Woodbridge, Virginia. CAREW was named on the lease of the residence. At the residence, CAREW and his female companion were interviewed regarding the incident. CAREW and his female companion stated that masked subjects broke into the residence by smashing the rear basement sliding door and demanded money from CAREW. Officers identified that several shoeboxes were missing. An officer located one shoebox outside the residence. The shoebox contained marijuana and $900 in

5

U.S. currency. Both CAREW and his female companion denied knowing where the marijuana came from.

17.     After detecting a strong odor of marijuana emanating from the residence, law enforcement obtained a search warrant for the residence. During this search of the residence, law enforcement located and seized 15 grams of marijuana, over $2,000 in U.S. currency, and ammunition for a .357 firearm. Law enforcement subsequently reviewed CAREW's criminal record and determined that he was a convicted felon and thus prohibited from possessing a firearm.

　　　　　　*ii.*     *Arrest of CAREW and seizure of DEVICES 1, 2, 3, 4 and 5*

18.     On January 28, 2014, law enforcement obtained an arrest warrant for CAREW based on the evidence from the November 29, 2013 home invasion incident. On January 28, 2014, law enforcement observed CAREW exit his vehicle and walk toward the front door of his Woodbridge residence. PWCPD detectives approached CAREW and stated he was under arrest. CAREW failed to comply with the officers' commands and fled on foot. Law enforcement subsequently took CAREW into custody and recovered $825 in U.S. currency from his pants pocket during a search incident to arrest.

19.     During this incident, PWCPD detectives seized DEVICE 5 from CAREW's hand after taking him into custody. PWCPD detectives also seized DEVICE 3 and DEVICE 4 from the ground after CAREW threw them when fleeing from law enforcement. I know based on my experience that individuals often attempt to hide or "ditch" their cellular phones if they believe that they will be seized by law enforcement in order to prevent their contents from being discovered.

6

20.     Shortly thereafter, detectives knocked on the door of the Woodbridge residence. Detectives detected an odor of marijuana when CAREW's female companion answered the door, and they obtained a search warrant for the residence. During the search, officers located a safe. CAREW provided the combination for the safe to the officers. In the safe, law enforcement located one pound of marijuana, $1,140 in U.S. Currency, and several rounds of handgun ammunition. After being read his *Miranda* rights, CAREW waived his rights admitted that all the contents of the safe belonged to him.

21.     During the search of the master bedroom, detectives seized DEVICE 1 and DEVICE 2 from the nightstand beside the bed.

22.     After the search, the PWCPD checked the DEVICES into their Property and Evidence Facility for storage pending the closure of the U.S. Postal Inspection's investigation of CAREW. On January 5, 2018, DEVICES 1, 2, 3, 4 and 5 were transferred from the PWCPD Property and Evidence Facility to FBI custody, where they were checked into the FBI's Northern Virginia Resident Agency's Evidence Control Center. The DEVICES have remained in the FBI evidence locker in Manassas, Virginia until present date.

23.     Also in the residence, detectives located and seized a piece of paper with the name "Shawna Haymon" and a Wells Fargo bank account number. Law enforcement subsequently determined that Shawna Haymon was the account owner. PWCPD contacted Shawna Haymon and interviewed her by phone. Shawna Haymon stated that her son was named "Jerry Haymon," and that he was involved in a business venture with a person in Virginia. Shawna Haymon and HAYMON live in Fresno, California. A review of the Wells Fargo bank account records reveal that the account was opened on December 5, 2013 with an opening deposit of $500. The next transaction was a $7,500 deposit made in Prince William County.

7

There were two additional deposits of $7,500 into the account from locations in Prince William County on December 23, 2013 and January 9, 2014. The deposits were followed by large cash withdrawals.

24.     Based on my training, experience and the facts of this case, I know that drug dealers often use significant others or relatives to register bank accounts, cars, homes and other assets in order to hide their activities from law enforcement. I believe that HAYMON opened the Wells Fargo bank account in his mother's name in order to receive cash deposits from CAREW as payment for shipments of controlled substances from California to Virginia.

        *iii.*       *FRESNO Parcels to the Eastern District of Virginia*

25.     According to the United States Postal Inspection Service ("USPIS"), between August 6, 3013 and January 29, 2014, approximately 32 parcels was mailed from the Fresno, California area to locations in the Eastern District of Virginia. The shipping weight of these parcels totaled approximately 305 pounds. During this period, the USPIS was able to identify and seize five parcels totaling approximately 43 pounds of marijuana.

26.     According to USPIS records, on October 16, 2013, a one-pound parcel was shipped from the Woodbridge residence with a sender name of "Nas Carew" to an address located on Birch Avenue in Fresno, California addressed to "Joshua Haymon." According to California Department of Motor Vehicles (DMV) records, HAYMON is a resident of the Birch Avenue address.

27.     On November 13, 2013, law enforcement seized a three-pound parcel shipped from a location in the Eastern District of Virginia to an address on North Tamera Avenue in Fresno, California. A narcotics canine presented a positive response to the parcel, so law enforcement obtained a search warrant for the parcel. Law enforcement discovered

approximately $52,500 inside the parcel wrapped in two vacuum-sealed bags. According to

California DMV records, HAYMON used the North Tamera Avenue as an address of record

until January 8, 2015.

28.     The chart below displays the USPIS records documenting parcels from several

locations in and around Fresno, California to locations around Woodbridge, Virginia. The yellow

highlighted parcels show parcels containing marijuana seized by the USPIS. The green

highlighted parcel shows the $52,500 cash seizure shipped from a location in Woodbridge,

Virginia to HAYMON's North Tamera Avenue address in Fresno, California.

| Label Number | Label Date | Lbs | Sender City | State | City | State | Contents |
|---|---|---|---|---|---|---|---|
| EM744094544US | 08/06/13 | 1 | FRESNO | CA | WOODBRIDGE | VA | |
| EU956001718US | 08/20/13 | 4 | FRESNO | CA | WOODBRIDGE | VA | |
| EU956001620US | 08/20/13 | 4 | FRESNO | CA | WOODBRIDGE | VA | |
| '14901159815759 813456 | 09/04/13 | 3 | Visalia | CA | WOODBRIDGE | VA | |
| EU900394660US | 09/19/13 | 8 | FRESNO | CA | WOODBRIDGE | VA | |
| EU928128531US | 09/19/13 | 2 | FRESNO | CA | WOODBRIDGE | VA | |
| EU928130226US | 09/26/13 | 4 | FRESNO | CA | DUMFRIES | VA | |
| EU929658204US | 10/01/13 | 10 | FRESNO | CA | WOODBRIDGE | VA | |
| EU988216851US | 10/03/13 | 9 | CLOVIS | CA | WOODBRIDGE | VA | |
| EU956005312US | 10/08/13 | 8 | FRESNO | CA | WOODBRIDGE | VA | |
| EU972343849US | 10/16/13 | 9 | FRESNO | CA | DALE CITY | VA | |
| EI252657328US | 10/16/13 | 1 | Nas Carew | VA | Joshua Haymon | FRESNO | CA |
| EU988217260US | 10/18/13 | 8 | FRESNO | CA | WOODBRIDGE | VA | |
| EU972344402US | 10/28/13 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EU972344416US | 10/28/13 | 12 | FRESNO | CA | WOODBRIDGE | VA | |
| EU985183434US | 10/31/13 | 11 | FRESNO | CA | DALE CITY | VA | |
| EU985183417US | 10/31/13 | 11 | FRESNO | CA | WOODBRIDGE | VA | |
| EU928129508US | 11/07/13 | 19 | FRESNO | CA | DALE CITY | VA | |
| EU928129510US | 11/07/13 | 19 | FRESNO | CA | DALE CITY | VA | |
| EU972344420US | 11/13/13 | 10 | FRESNO | CA | DALE CITY | VA | |
| EU988212829US | 11/13/13 | 11 | FRESNO | CA | WOODBRIDGE | VA | 7Lb 3oz MJ |
| EI134432820US | 11/13/13 | 3 | WOODBRIDGE | VA | FRESNO | CA | $52,500 USC |
| EU988212863US | 11/20/13 | 15 | FRESNO | CA | DALE CITY | VA | |
| EK076697187US | 11/26/13 | 10 | | | WOODBRIDGE | VA | |
| EK079538828US | 12/13/13 | 17 | FRESNO | CA | WOODBRIDGE | VA | |
| EU988212700US | 12/30/13 | 14 | FRESNO | CA | DALE CITY | VA | |
| EU929657535US | 01/06/14 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EU929660335US | 01/09/14 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EU929660344US | 01/09/14 | 15 | FRESNO | CA | WOODBRIDGE | VA | |
| EK039258921US | 01/15/14 | 7 | CLOVIS | CA | WOODBRIDGE | VA | 7Lb 10oz MJ |
| EK039258918US | 01/15/14 | 6 | CLOVIS | CA | WOODBRIDGE | VA | 6Lb 9oz MJ |
| EK013691171US | 01/17/14 | 14 | Fresno | CA | WOODBRIDGE | VA | |
| EU974937536US | 01/24/14 | 12 | FRESNO | CA | DUMFRIES | VA | 9Lb 13oz MJ |
| EK077471902US | 01/29/14 | 11 | FRESNO | CA | WOODBRIDGE | VA | 11Lb 2oz MJ |

D.    Current investigation of CAREW and HAYMON

29.    As stated previously in this affidavit, on April 13, 2018, CAREW pled guilty in

the Eastern District of Virginia to conspiracy to distribute 1,000 kilograms or more of marijuana

and THC, in violation of Title 21, United States Code, Sections 841 and 846. Evidence in the

case against CAREW included photos and videos from CAREW's social media depicting drug

distribution-related activity and possession of firearms.

30.    During law enforcement interviews in 2018, cooperating defendants from

CAREW's DTO identified several marijuana and THC suppliers living in California. One of the

sources of supply identified was JERRY HAYMON ("HAYMON") of Fresno, California.

31.    On May 21, 2018, law enforcement interviewed CD-1. During this interview, CD-

1 advised law enforcement that a person in California named JERRY HAYMON or "Bear" was

one of CAREW's sources of supply for marijuana. CD-1 stated he has personally sent money to

HAYMON in California and that HAYMON purchased, packaged, and mailed the orders of

marijuana to addresses he (CD-1) provided him. CD-1 stated CAREW and members of his

organization had this arrangement with HAYMON since approximately 2013. Law enforcement

showed CD-1 a known photograph of HAYMON from his social media account. CD-1 positively

identified HAYMON as the person in the photograph and as the person he knew as "Bear". CD-1

stated he had communicated with HAYMON using his cellphone in order to facilitate the

shipments of controlled substances until right before CD-1's arrest in December 2017. I know

that drug dealers often communicate with their suppliers using cellular phones, especially if they

are not in the same area or state.

32.    On September 4, 2018, law enforcement interviewed CD-2. During the interview,

CD-2 stated that he was introduced to HAYMON through CD-1. CD-2 stated that he had

10

traveled to California and met HAYMON in person. When he met HAYMON, CD-2 gave HAYMON approximately $40,000 in cash in exchange for approximately 25 pounds of marijuana. CD-2 also stated that members of CAREW's DTO obtained delivery addresses where the marijuana parcels could be shipped. These addresses were then sent to HAYMON in California where he would package and ship the parcels.

33.     HAYMON is now the target of an FBI investigation. The FBI would like to search the DEVICES for evidence of CAREW's drug distribution conspiracy with HAYMON and others. Law enforcement has not previously searched the DEVICES, and there is probable cause to believe that evidence of CAREW drug distribution and use of firearms with HAYMON and others will be located on the DEVICES.

## TECHNICAL TERMS

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.  *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include:  storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

11

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

12

d.  *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets,

13

and presentations. PDAs may also include GPS technology for determining the
location of the device.

    f. *Internet*: The Internet is a global network of computers and other electronic
devices that communicate with each other. Due to the structure of the Internet,
connections between devices on the Internet often cross state and international
borders, even when the devices communicating with each other are in the same
state.

    35. Based on my training, experience, and research, and from consulting the
manufacturer's advertisements and product technical specifications available online at
http://www.apple.com/iphone/, I know that the Device has capabilities that allow it to serve as
the following: a wireless telephone, digital camera, portable media player, GPS navigation
device, and PDA. In my training and experience, examining data stored on smart phones can
uncover, among other things, evidence that reveals or suggests who possessed or used the device.

    36. In my training and experience, examining data stored on devices of this type can
uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

    37. Based on my knowledge, training, and experience, I know that electronic devices
can store information for long periods of time. Similarly, things that have been viewed via the
Internet are typically stored for some period of time on the device. This information can
sometimes be recovered with forensics tools.

    38. *Forensic evidence.* As further described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as direct
evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

15

39.     *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES

consistent with the warrant.  The examination may require authorities to employ techniques,

including but not limited to computer-assisted scans of the entire medium, that might expose

many parts of the device to human inspection in order to determine whether it is evidence

described by the warrant.

40.     *Manner of execution.*  Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

41.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the DEVICES described in Attachment A to seek the information

described in Attachment B.

Respectfully submitted,

Mark J. Grado
Special Agent
Federal Bureau of Investigations

Subscribed and sworn to before me on December 3, 2018:

/s/

Michael S. Nachmanoff
United States Magistrate Judge

The Honorable Michael S. Nachmanoff
United States Magistrate Judge

16

## ATTACHMENT A

The property to be searched is listed below (hereinafter referred to as "the Device").  The Device is currently located in the FBI evidence locker, which is located at 9325 Discovery Boulevard, Manassas, Virginia 22043, which is within the Eastern District of Virginia. The DEVICES described as an Apple iPhone IMEI: 990002824973604, a Kyocera cell phone MEID: 268435459905978861, a ZTE T-Mobile cell phone IMEI: 865074012306063, a Huawei cell phone IMEI: 860525020367434, and a Samsung cell phone IMEI: 355880056598929.

The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of

Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute controlled

substances), Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm),

and Title 18, United States Code, Section 924(c)(1)(A) (use and carry of a firearm during and in

relation to drug trafficking offenses), and involve Nasiru Carew and Jerry Haymon, including:

   a.   any conversations, whether through text messages or other applications, where

        Carew discusses controlled substances, firearms, or the transfer of money between

        bank accounts and the purchase of high value items;

   b.   lists of customers and related identifying information;

   c.   types, amounts, and prices of drugs trafficked as well as dates, places, and

        amounts of specific transactions;

   d.   any information related to sources of drugs (including names, addresses, phone

        numbers, or any other identifying information);

   e.   any information related to sources or purchases of firearms;

   f.   any photographs or videos of controlled substances or firearms; and

   g.   all bank records, checks, credit card bills, account information, and other financial

        records.

2.      Evidence of user attribution showing who used or owned the DEVICES at the

time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history.